**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**LISA KENNEDY,**

                                        **Plaintiff,**

          **vs.**                                    **5:13-CV-1540**
                                                      **(MAD/ATB)**

**FEDERAL EXPRESS CORPORATION and**
**ALVIN BEAL,** *as Aider and Abettor*,

                                        **Defendants.**
_____

| | |
|---|---|
| **APPEARANCES:** | **OF COUNSEL:** |

**BOUSQUET HOLSTEIN, PLLC**                **JOHN L. VALENTINO, ESQ.**
One Lincoln Center                         **JOSHUA S. WERBECK, ESQ.**
110 West Fayette Street, Suite 900         **LAWRENCE M. ORDWAY, JR., ESQ.**
Syracuse, New York 13202                   **KAVITHA JANARDHAN, ESQ.**
Attorneys for Plaintiff

**BOND, SCHOENECK & KING, PLLC**           **LARRY P. MALFITANO, ESQ.**
One Lincoln Center                         **KERRY W. LANGAN, ESQ.**
110 West Fayette Street
Syracuse, New York 13202
Attorneys for Defendant Federal Express

**FEDERAL EXPRESS CORPORATION**           **WHITNEY K. FOGERTY, ESQ.**
3620 Hacks Cross Road
Building B
3rd Floor
Memphis, Tennessee 38125
Attorneys for Defendant Federal Express

**PAPPAS, COX, KIMPEL, DODD &**            **THOMAS J. MURPHY, ESQ.**
**LEVINE, PC**
614 James Street, Suite 100
Syracuse, New York 13203
Attorneys for Defendant Alvin Beal

**Mae A. D'Agostino, U.S. District Judge:**

                **MEMORANDUM-DECISION AND ORDER**

                        **I. INTRODUCTION**

Plaintiff commenced this action on December 13, 2013, alleging disparate treatment based on her gender, hostile work environment and retaliation under 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York State Human Rights Law ("NYHRL"). *See* Dkt. No. 1. Currently before the Court is Defendant Federal Express Corporation's motion for summary judgment. *See* Dkt. No. 51.

## II. BACKGROUND

**A.     FedEx's Relevant Policies**

Defendant Federal Express Corporation ("FedEx") is a transportation and delivery company that maintains certain policies that purport to prohibit discrimination, harassment and retaliation. *See* Dkt. No. 58 at ¶ 1. FedEx's Anti-Harassment Policy, which provides examples to illustrate the type of conduct that may constitute sexual harassment, directs employees to immediately report all allegations of discrimination or harassment through one of several avenues and advises employees that retaliation is prohibited. *See id.* at ¶ 2. Employees are advised in the policy that they can report allegations of harassment to any member of management, Human Resources, or FedEx's Human Resources Compliance Department in Memphis, Tennessee. *See id.* at ¶ 3. FedEx even maintains a toll-free alert line number that employees can call to lodge complaints, including anonymous complaints. *See id.* at ¶ 4.

According to the corporate policy, complaints of harassment and discrimination are investigated in accordance with FedEx's Guaranteed Fair Treatment Procedure/EEO Complaint Process. *See id.* at ¶ 5.[1] This policy also identifies the individuals or departments to whom

---

[1] The Court notes that, while Plaintiff acknowledges the existence of this policy, she "DENIES that thorough or proper investigations are conducted, at least with respect to [Plaintiff's] claims, and further DENIES that the Guaranteed Fair Treatment Procedure/EEO Complaint Process is conducted in a non-discriminatory and/or retaliatory manner to prohibit

(continued...)

complaints of discrimination or harassment can be made, advises employees that a thorough investigation will be conducted and reaffirms that retaliation is prohibited. *See id.*

## B.    Plaintiff's Knowledge of FedEx's Relevant Policies

Plaintiff, Lisa Kennedy, is a former Operations Manager who was employed by FedEx from 1997 until her resignation in April 2010. *See* Dkt. No. 58 at ¶ 6. At the time of her hire, Plaintiff participated in a training program for management employees that covered employee-retaliation issues, general employment-related policies, computer systems, and general corporate policy. *See* Dkt. No. 51-1 at ¶ 7; Dkt. No. 58 at ¶ 7. In October 2006 and September 2007, Plaintiff received additional training in the area of employee relations for management. *See* Dkt. No. 58 at ¶ 8.

During her employment with FedEx, Plaintiff received multiple copies of FedEx's Employee Handbook, which contains a summary of FedEx's Anti-Harassment Policy and EEO Complaint Process. *See id.* at ¶ 9. A copy of the Handbook was always available to Plaintiff at the Station where she worked. *See id.* at ¶ 10. In addition to its Employee Handbook, FedEx publishes a People Manual, which contains full versions of FedEx's employment-related policies and procedures, including its Equal Employment Opportunity and Anti-Harassment Policies, as well as its EEO Complaint Process. *See id.* at ¶ 11. Like the Handbook, Plaintiff was aware of and had access to FedEx's People Manual throughout her employment. *See id.* at ¶ 12. Finally, FedEx's employment-related policies and procedures were available to Plaintiff at all times on FedEx's intranet. *See id.* at ¶ 13.

---

[1](...continued)
discrimination, harassment and/or retaliation." Dkt. No. 58 at ¶ 5.

Plaintiff concedes that throughout her employment with FedEx, she had knowledge of FedEx's policies prohibiting discrimination, harassment and retaliation, as well as the procedures for reporting violations of policy, and that she received training on all of them. *See id.* at ¶ 14. In fact, it was part of Plaintiff's job responsibilities as a manager for FedEx to be familiar with these policies. *See id.* at ¶ 15. As a manager, Plaintiff had an obligation to immediately report any allegation of harassment or discrimination. *See* Dkt. No. 51-1 at ¶ 16; Dkt. No. 58 at ¶ 16.

## C.    Plaintiff's Employment Application with FedEx

When Plaintiff first applied for employment with FedEx, she executed an Employment Agreement as part of her application which contained terms and conditions of employment. *See* Dkt. No. 58 at ¶ 17. Specifically, the Employment Agreement contained a provision stating that, if Plaintiff wishes to bring legal action against FedEx, she is required to do so "'within the time prescribed by law or 6 months from the date of the event forming the basis of my lawsuit, whichever expires first.'" *Id.* (quotation and other citation omitted). Plaintiff concedes that she read the Employment Agreement, understood its terms before signing and signed the Agreement voluntarily and without pressure. *See id.* at ¶ 18.

## D.    Nature of Plaintiff's Employment at FedEx's Syracuse Station

For the majority of her tenure at FedEx, including calendar years 2009 and 2010, Plaintiff worked out of FedEx's Syracuse Station. *See id.* at ¶ 19. As an Operations Manager, Plaintiff was responsible for supervising a team of employees that included package handlers and couriers. *See id.* at ¶ 20. She was also responsible for structuring delivery routes to ensure the efficient and timely delivery of packages by her couriers, scheduling, performing audit functions including time card and fuel audits, ensuring compliance with safety requirements, and coordinating ground and sort operations. *See id.* FedEx's Job Description for the Operations Manager position held by

Plaintiff specifically lists "ensur[ing] all applicable company policies and procedures are followed" and "support[ing] corporate EEO/AAP goals and objections" as functions of the position. *See* Dkt. No. 51-1 at ¶ 21; Dkt. No. 58 at ¶ 21.

**E.    Defendant Beal's Training on FedEx's Relevant Policies**

Plaintiff began reporting directly to Defendant Alvin Beal when he assumed the role of Senior Manager for the Syracuse and Watertown Stations beginning in mid-November 2008. *See* Dkt. No. 58 at ¶ 22. Like Plaintiff, Defendant Beal testified that he received training on FedEx's employment-related policies, including its Anti-Harassment Policy. *See* Dkt. No. 51-1 at ¶ 23; Dkt. No. 58 at ¶ 23. Defendant Beal participated in LEAD 2 training in July 2009, which is a week-long leadership class for management. *See* Dkt. No. 51-4 at ¶ 8; Dkt. No. 51-7 at 27-28. In 2007, Defendant Beal completed a diversity training course during which sexual harassment was discussed. *See id.* In June 2006, Defendant Beal completed an employee relations training class for management, as well as advanced employment law training. *See id.* Further, in 2005 and March of 2010, Defendant Beal attended sexual harassment awareness training for management. *See* Dkt. No. 51-4 at ¶ 8; Dkt. No. 51-7 at 28-30.[2]

**F.    Plaintiff's Allegations of Harassment**

Plaintiff alleges that Defendant Beal first began to harass her in January 2009 by asking if he could come over to her apartment to get to know her on a personal level. *See* Dkt. No. 58 at ¶ 26. Between January and March 2009, Plaintiff contends that Defendant Beal came to her apartment one night and engaged in a lengthy conversation about inter-racial dating; frequently

---

[2] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

called her into his office for one-on-one meetings during which he would discuss his views on societal issues and continued to ask her if he could come over to her apartment. *See id.* at ¶ 27.

In March 2009, Plaintiff suffered a concussion while ice skating and was absent from work until early June 2009. *See id.* at ¶ 28. Plaintiff alleges that the harassment by Defendant Beal continued within a week of her return to work in June. *See id.* at ¶ 29. Plaintiff claims that, on an almost daily basis, Defendant Beal made comments such as "you smell nice today," called her into his office, locked the door, sat on the edge of his desk physically close to her and held lengthy meetings with her during which he discussed personal matters. *See id.*

According to Plaintiff, Defendant Beal's harassment escalated to physical touching in June of 2009. *See id.* at ¶ 30. Plaintiff claims that at least four or five times in June 2009, Defendant Beal squeezed her breast, attempted to reach up her shirt and kissed her, despite her protests, during closed-door meetings in his office. *See id.* Moreover, Plaintiff alleges that "the behavior continued into July 2009, every couple of days;" and on at least one occasion in July, Defendant Beal took Plaintiff's hand and placed it on his genitals. *See id.* at ¶ 31.

Plaintiff alleges that the physical touching and inappropriate meetings and comments continued into August 2009, every few days, culminating on Sunday, August 23, 2009, when she claims that Defendant Beal forced her to have sexual intercourse with him at the Syracuse Station. *See* Dkt. No. 58 at ¶ 34. According to Plaintiff, Defendant Beal continued to touch her inappropriately in September of 2009 despite her protests and, on September 27, 2009, Defendant Beal forced her to have sexual intercourse with him a second time. *See* Dkt. No. 58 at ¶ 38.

Plaintiff, having been a manager for more than ten years, knew that Defendant Beal's physical touching of her violated FedEx policy, knew that it was her responsibility as a manager to ensure that FedEx policies and procedures were followed, and knew that she had an obligation

to report Defendant Beal's conduct. *See id.* at ¶ 32. Plaintiff claims, however, that she did not immediately report Defendant Beal's conduct "due to the emotional trauma caused by the abuse and her fear of losing her job." *Id.* Further, Plaintiff contends that she did not immediately report Defendant Beal's conduct because he told her that "'everything that happens in our station stays in our station'" and further indicated that he is the first to know when a complaint has been filed. *See id.* During her deposition, when asks if she knew that she had an obligation under FedEx's policy to report Defendant Beal's conduct, Plaintiff responded as follows:

> A.    I knew that I had an obligation to report it, yes. I knew if somebody came to me with something, yes, I had an – I would have had an obligation to report it. But did I feel like I had an obligation? I didn't look at it as an obligation. I looked at it as, as soon as I reported it, then that was going to be – I knew that – that's why I didn't report it, because I didn't have to have a whole huge issue about it. I didn't want to be judged. I didn't want to have an investigation.
>
> Q.    Okay.
>
> A.    I just didn't want to deal with it.

Dkt. No. 51-3 at 59. Although Plaintiff claims that part of the reason she did not immediately report Defendant Beal's conduct was because she was afraid she would lose her job, she admits that she is not aware of anyone at FedEx who had complained of harassment and lost his or her job. *See* Dkt. No. 58 at ¶ 40.

Sheila Accorso, a Human Resources Advisor for FedEx with whom Plaintiff had a good relationship, was in the Syracuse Station several times in July and August 2009. *See id.* at ¶ 36. Despite Ms. Accorso's presence, Plaintiff still did not report Defendant Beal's conduct because she knew that Ms. Accorso "would be obligated to do something about it and, if [Plaintiff] told her what happened, [Plaintiff] would have had to have been prepared to tell everything that was

going on" and she was too embarrassed to do so. Dkt. No. 51-3 at 62-63. When asked why she

did not report Defendant Beal's conduct in September 2009, Plaintiff testified as follows:

> A.     I was still trying to believe that it didn't happen, 'cause I
>        didn't want it to happen. This was my career. I'm a single
>        mother. I have a son with – who has special needs. I – I'd
>        been there 13 years. He had only been there a year, and
>        there was no way I was going to let this guy cause me to
>        leave my career over – this is my station. It was the place I
>        had been, I was comfortable with.

*Id.* at 71-72.

When asked if she believed in September 2009 that Defendant Beal's conduct violated

FedEx's policy, Plaintiff responded as follows:

> A.     Oh, I know it did.

> Q.     And you knew FedEx doesn't tolerate sexual harassment?

> A.     Yeah, and I was scared to death because I didn't want
>        anything to happen.

> Q.     To you or to him?

> A.     To me, to him – to me.

> Q.     What did you think was going to happen to you?

> A.     I had no idea. I had no idea.

> Q.     What did you think was going to happen to you if you
>        reported it to FedEx?

> A.     I figured, just like it did, that it would be my word against
>        his word, and there was nobody there the first time so what
>        – if nobody's there this time, nobody was there in all the
>        time I was in his office, nobody know – nobody saw,
>        nobody saw anything. It's a whole private thing –

> Q.     Right.

> A.     – which is exactly what I didn't want to happen, is exactly
>        what did happen.

Dkt. No. 51-3 at 75-76. Despite her belief that Defendant Beal's conduct violated FedEx policy, she did not immediately report the incidents.

According to Plaintiff, although less frequent, the inappropriate touching continued approximately once per week following the second alleged incident of sexual intercourse until December 31, 2009, when Plaintiff confronted Defendant Beal and told him that "the new year starts right now." Dkt. No. 58 at ¶ 43. Plaintiff claims that the incidents of inappropriate conduct occurred less frequently during this time because she was frequently called away from the Syracuse Station during this time and was often "on the road." Dkt. No. 51-3 at 80-81. Moreover, Plaintiff claims that the incidents happened less frequently during the time period from September 27, 2009 through January 2010 because she repeatedly told him to "back off," which would anger Defendant Beal and lead him to be quiet for several days thereafter. *See id.* at 81-82.

The last alleged incident of harassment occurred on December 31, 2009. *See* Dkt. No. 58 at ¶ 44. The first time that Plaintiff reported any of Defendant Beal's conduct to FedEx was on February 1, 2010. *See id.* at ¶ 45. On the night of February 1, 2010, Plaintiff called Ms. Accorso and left a message stating that she urgently needed to speak with her. *See id.* at ¶ 46. Ms. Accorso called her back within minutes; and, while the two did not discuss Plaintiff's allegations in great detail during this call, Plaintiff reported that Defendant Beal was harassing her. *See id.* at ¶ 47. Plaintiff did not, however, report to Ms. Accorso that Defendant Beal forced her to have sexual intercourse with him. *See id.* at ¶ 48.

## G.    FedEx's Response to Plaintiff's Allegations

After speaking to Plaintiff, Ms. Accorso immediately contacted Colleen Altavilla, Managing Director and Defendant Beal's supervisor, as well as her own supervisor who was an

HR Manager. *See* Dkt. No. 58 at ¶ 49. According to Ms. Accorso, her primary concern that night was to ensure that Plaintiff did not go back to work with Defendant Beal on the following day. *See* Dkt. No. 51-5 at 23-24. Ms. Accorso called Plaintiff back a second time the night of February 1, 2010, and told Plaintiff not to go to work at the Station the following day, that Ms. Altavilla would provide an explanation for her absence, and requested that Plaintiff meet with Altavilla and Accorso the next morning at a FedEx facility located at the Syracuse Airport known as the "Syracuse Ramp." Dkt. No. 58 at ¶ 51. Accorso and Altavilla traveled from Rochester, New York where they were based and met with Plaintiff at the Syracuse Ramp the following morning, February 2, 2010. *See id.* at ¶ 52. At the request of Accorso and Altavilla, Plaintiff filled out an internal EEO complaint form in which she detailed her allegations, but left out any reference to sexual intercourse because she was "still embarrassed" about it and "wasn't ready to face that yet." *Id.* at ¶ 53; Dkt. No. 51-3 at 90. According to Accorso, she and Altavilla then discussed Plaintiff's allegations with her. *See* Dkt. No. 58 at ¶ 54.

After Plaintiff left, Altavilla called Defendant Beal and requested that he come to the Syracuse Ramp for an interview. *See id.* at ¶ 55. Upon arrival, Defendant Beal was questioned for several hours about the allegations, most of which he denied. *See id.* at ¶ 56. At the end of Defendant Beal's interview, he was suspended with pay pending a more thorough investigation. *See id.* at ¶ 57; Dkt. No. 51-5 at 29-30. According to Altavilla, Defendant Beal was suspended in pay, at least in part, "to separate him in the workplace" so that they could conduct an investigation and because of the nature of the allegations. *See* Dkt. No. 51-6 at 17.

On February 3, 2010, Accorso and Altavilla went to the Syracuse Station to continue their investigation. *See* Dkt. No. 58 at ¶ 58. Because Plaintiff could not identify any witnesses to the alleged conduct, Accorso and Altavilla attempted to identify and interview individuals who may

have had knowledge of the situation. *See* Dkt. No. 51-5 at 30-32. Further, according to Accorso, she extended the interview to individuals who worked with Defendant Beal to determine if anyone else had experienced similar inappropriate conduct. *See id.* at 33. As part of their investigation, Accorso and Altavilla interviewed the three other Operations Managers at the Syracuse Station – Cindy Smith, Mike Venezia, and Mitch Cornish – as well as the Operations Manager at the Watertown Station, Michelle McGrann. *See* Dkt. No. 58 at ¶ 59.[3] According to Accorso, questions were posed to these managers about their interactions and relationship with Defendant Beal, contact with Beal outside of work, the length and frequency of one-on-one meetings they had with Beal, their observations of Beal's meetings with other managers, if they had ever received complaints from anyone about feeling uncomfortable in the work environment, whether they had witnessed or perceived discrimination, and whether Beal had ever made any remarks about women they considered to be inappropriate. *See* Dkt. No. 51-4 at ¶ 14.

Accorso also interviewed Donna Talarico, a Service Assurance Agent who had an office that connected with Beal's; Kelley Mathewson, a Service Assurance Manager at the Syracuse Station who frequently had contact with Beal due to the nature of her job and who was in touch with the "rumor mill;" and Mary Maglione, a female employee who had previously lived with Plaintiff and with whom Plaintiff may have shared concerns. *See* Dkt. No. 58 at ¶ 61; Dkt. No. 51-4 at ¶ 15; Dkt. No. 51-5 at 31-35. They were questioned about their interactions with Defendant Beal and whether they were aware of any managers who were uncomfortable around him. *See id.* According to Accorso, while her investigation did reveal that Plaintiff may have

---

[3] The Court notes that, while Plaintiff admits many of the allegations concerning who was interviewed, she denies "that any investigation conducted was complete, proper or intended to substantiate or confirm [her] allegations. The scope of the investigation and the motivations of Accorso and Altavilla are in dispute and lay at the core of [Plaintiff's] claims." *E.g.*, Dkt. No. 58 at ¶ 59-61.

spent more time in Defendant Beal's office than other managers, none of the employees and managers interviewed offered any information that corroborated or substantiated Plaintiff's claims of sexual harassment. *See* Dkt. No. 58 at ¶ 62; Dkt. No. 51-4 at ¶ 16. Moreover, Accorso conducted a review of cell phone records because Plaintiff claimed that Defendant Beal had called her on her personal cell phone. *See id.* at ¶ 63; Dkt. No. 51-4 at ¶ 16. Accorso concluded that Plaintiff had provided Defendant Beal with her personal cell phone number; and, while Defendant Beal called Plaintiff twenty (20) times over an eight (8) month period, Plaintiff called Defendant Beal from her personal cell phone nine (9) times during that same time period. *See* Dkt. No. 58 at ¶ 64; Dkt. No. 51-5 at 72-73.

During her investigation, Accorso contacted FedEx's HR Compliance Department to determine if any other similar complaints had been made against Defendant Beal. *See id.* at ¶ 65; Dkt. No. 51-5 at 12-14. According to Accorso, while one other complaint against Defendant Beal was on file, the HR Compliance Department informed her that it was not similar in nature to the sexual harassment allegations made by Plaintiff. *See id.* at ¶ 66; Dkt. No. 51-5 at 15.

On February 9, 2010, Accorso re-interviewed Defendant Beal, who was still on suspension. *See* Dkt. No. 58 at ¶ 67. Defendant Beal continued to deny the majority of Plaintiff's allegations and continued to deny engaging in any inappropriate behavior of a sexual nature with Plaintiff. *See id.* Shortly thereafter, Accorso interviewed Plaintiff for a second time. *See id.* at ¶ 68.

On March 2, 2010, one month after she initially reported the harassment, Plaintiff called Accorso and reported for the first time that Defendant Beal forced her to have sexual intercourse with him on Sunday, August 23, 2009 and Sunday, September 27, 2009 at the Syracuse Station. *See* Dkt. No. 58 at ¶ 70. The following day, March 3, 2010, Accorso met with Plaintiff at FedEx's

District Office in Rochester, New York. *See id.* at ¶ 71. According to Accorso, following her meeting with Plaintiff, she continued her investigation, but was unable to identify any new witnesses to interview. *See id.* at ¶ 72. Therefore, Accorso claims that she attempted to verify whether Defendant Beal and Plaintiff were present in the Syracuse Station on the two Sundays when Plaintiff claimed the intercourse occurred. *See* Dkt. No. 51-1 at ¶ 73. FedEx claims that Accorso checked with its security personnel to see if any video footage was available, but camera placement was limited at the Syracuse Station, and no useful footage was available. *See id.* at ¶ 74. Further, according to Accorso, a forensic review was conducted of computer records to determine whether there was activity on the computers utilized by Defendant Beal and Plaintiff at the Syracuse Station on either of the two days in question. *See id.* at ¶ 75. "While activity was noted on Beal's computer on August 23, 2009, it could not be confirmed that Beal gained access to the Station that day, and no activity appeared on Beal's computer on September 27, 2009." *Id.* at ¶ 76. Further, FedEx claims that no activity was discovered on Plaintiff's computer for either August 23 or September 27, 2009. *See id.* at ¶ 77.

Plaintiff, however, disputes the thoroughness of FedEx's investigation after she reported the alleged forced sexual intercourse. *See* Dkt. No. 58 at ¶ 73. For example, Plaintiff contends that she discovered evidence "in the form of two documents that are titled the 'Time Card Report.' These reports are dated September 27, 2009, which is the second Sunday when Ms. Kennedy alleges that Beal sexually assaulted her." *Id.* According to Plaintiff, the "reports substantiate Ms. Kennedy's claims and testimony throughout that she went into the Syracuse Station on September 27, 2009 to work on time cards because Beal had told her that she was behind and that she needed to catch up on them." *Id.* Moreover, Plaintiff asserts that "[t]hey also substantiate [her] allegations in that she testified that she arrived at the Syracuse Station at about noontime on

Sunday September 27, 2009." *Id.* Plaintiff also argues that "Accorso failed to even attempt to substantiate her claims by speaking with or reviewing the records from her treating physician, treating therapist or Vera House, which is a local rape crisis center." *Id.* As to the forensic review of the computers, Plaintiff engaged a computer expert, Steven Ocasio. *See* Dkt. No. 60. According to Mr. Ocasio, the review performed by FedEx unlikely "reflects an adequate and thorough search of the data sources available to FedEx." *Id.* at ¶¶ 29-30. Specifically, Mr. Ocasio contends that the Computer Report prepared by FedEx only addressed whether Plaintiff and Defendant Beal turned their computers on after a full power shutdown, but did not address whether Plaintiff or Beal unlocked their computers after a lockout without a full power shutdown. *See id.* at ¶ 29. Mr. Ocasio also concluded that FedEx did not check for several indicators of computer activity, including browser history and event logs. *See id.* at ¶¶ 26, 28.

Defendant Beal, who remained on suspension since February 2, 2010, was interviewed for a third time by Accorso and Altavilla in March 2010, within a few days of Plaintiff raising her additional allegations. *See* Dkt. No. 58 at ¶ 78. According to FedEx, Defendant Beal "adamantly denied, and continues to deny, forcing [Plaintiff] to have sexual intercourse with him." *Id.*

FedEx's investigation concluded on March 10, 2010. *See id.* at ¶ 79. According to FedEx, while it "did identify certain practices that were inconsistent with its policies, culture and philosophy, FedEx was unable to substantiate [Plaintiff's] allegations of sexual harassment." Dkt. No. 51-1 at ¶ 79. Plaintiff, however, argues that FedEx could have substantiated her claims had it conducted a "genuine inquiry." Dkt. No. 58 at ¶ 79. Defendant Beal was issued a written counseling by Altavilla instructing him to refrain from hugging employees, refrain from visiting managers' and employees' homes, and to provide objective performance standards for evaluating managers. *See id.* at ¶ 80. In addition, despite his prior training, Defendant Beal was also

required to complete additional sexual harassment training on March 11, 2010 before he could return to work, which he did. *See id.* at ¶ 81. Accorso and Altavilla also considered transferring Defendant Beal to a different location, but there were no open Senior Management positions in the surrounding area. *See id.* at ¶ 82. Transferring Defendant Beal would have required transferring him to a position more than fifty (50) miles away, which Accorso and Altavilla were unwilling to do because it would have required him moving his family and their investigation did not substantiate the claims against him. *See id.*; *see also* Dkt. No. 51-5 at 54.

On March 11, 2010, a closure letter was prepared by Altavilla advising Plaintiff that the investigation was complete. *See* Dkt. No. 58 at ¶ 84. The following day, March 12, 2010, Accorso called Plaintiff prior to Plaintiff receiving Altavilla's letter to discuss the results of the investigation with her, to advise her that she would be receiving a closure letter, and to advise her that Defendant Beal would be returning to the Syracuse Station. *See id.* at ¶ 85. Moreover, Accorso offered Plaintiff the option of taking a lateral transfer to an open Operations Manager position at the Syracuse Ramp where she would have reported to a different Senior Manager. *See id.* at ¶ 86; Dkt. No. 51-3 at 100-101. Plaintiff, however, did not accept this transfer. *See id.* at ¶ 87. Accorso also explained to Plaintiff that Defendant Beal would return to the Watertown Station on March 15, 2010, and then return to the Syracuse Station on March 23, 2010. *See id.* at ¶ 88. According to FedEx, "Accorso further explained that she would be present in the Syracuse Station when Beal returned and that she would meet with both [Plaintiff] and Beal that morning to assess the situation." Dkt. No. 51-1 at ¶ 88.[4] Moreover, it was determined that, if Plaintiff

_____

[4] The Court notes that Plaintiff claims that the use of the "assess" "mischaracterized the testimony regarding the scope of and purpose for any assessment." Dkt. No. 58 at ¶ 88. According to Accorso's testimony, she wanted to be present to "evaluate" the situation, because she had to consider not only the well being of Plaintiff and Defendant Beal, but also the other

(continued...)

refused the transfer, Accorso would "continue to monitor the relationship" between Plaintiff and Defendant Beal after he returned to work. *See* Dkt. No. 58 at ¶ 89.

**H.      Plaintiff's separation from employment with FedEx**

Plaintiff did not return to the Syracuse Station on March 23, 2010. *See id.* at ¶ 90. Instead, Plaintiff took a leave of absence and, on April 29, 2010, she submitted a resignation letter in which she stated, among other things, that she "realized that there's no way that [she] could come back to work if he was going to be [her] boss." *Id.*

Plaintiff's pay was not cut in 2009 or 2010, her hours did not change, and her job responsibilities remained the same during this time period. *See* Dkt. No. 58 at ¶ 95. Plaintiff had not made any complaint of discrimination, harassment or retaliation prior to calling Accorso on February 1, 2010 and filing her internal EEO form on February 2, 2010. *See id.* at ¶ 96.[5]

Plaintiff filed a charge of discrimination with the EEOC on June 18, 2010 alleging harassment and discrimination. *See* Dkt. No. 51-1 at ¶ 97; Dkt. No. 58 at ¶ 97. On November 13, 2012, the EEOC issued its determination, finding that there is reasonable cause to believe that Plaintiff was discriminated against "when she was subjected to sexually offensive behavior from her immediate supervisor." Dkt. No. 59-3 at 3. Further, the EEOC determined that Plaintiff "was constructively discharged after she was returned to a position under the alleged harasser's immediate authority." *Id.*

## III. DISCUSSION

**A.      Summary Judgment Standard**

---

[4](...continued)
employees at the Syracuse Station. *See* Dkt. No. 51-5 at 56-57.

[5] Plaintiff also attempted to pursue criminal charges against Defendant Beal, but they were ultimately dismissed by the District Attorney due to lack of evidence. *See* Dkt. No. 58 at ¶ 91.

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.      Timeliness of Plaintiff's Claims Under the New York State Human Rights Law**

FedEx contends that, at the time Plaintiff completed her employment application, she executed an Employment Agreement which contained terms and conditions of employment. *See* Dkt. No. 51-2 at 10. According to FedEx, the "Agreement contains a clear and unambiguous provision stating that to the extent the law allows, [Plaintiff] is required to bring legal claims against Federal Express 'within the time prescribed by law or 6 months from the date of the event

forming the basis of my lawsuit, whichever expires first.'" *Id.* (citing Dkt. No. 51-1 at ¶ 17).

FedEx argues that Plaintiff's "claims of gender discrimination[,] disparate treatment, harassment

and retaliation under the NYSHRL arise out of conduct that she contends occurred between

January 2009, the date she alleges Beal first began to harass[ ] her, and March 12, 2010, the date

that she learned Beal would be returning to the Syracuse Station." *Id.* at 11. As such, FedEx

contends that Plaintiff "was contractually obligated to bring these claims against Federal Express,

on or before September 12, 2010, or at the latest October 29, 2010 (six months after she

resigned)." *Id.*

Plaintiff does not challenge the validity of the parties' contractual agreement to a six-

month statute of limitation. Rather, Plaintiff contends that the statute of limitations was met when

she filed a charge of discrimination with the EEOC within six months of her resignation. *See*

Dkt. No. 57 at 10-11. Further, Plaintiff argues that, "[p]ursuant to EEOC regulations, a charge

filed before the EEOC is automatically deemed to be filed with a deferral state agency (in this

case, the New York State Division of Human Rights) for statute of limitations purposes." *Id.* at

10 (citing 29 C.F.R. § 1601.13) (other citations omitted). Plaintiff argues that, since her EEOC

charge was filed on June 18, 2010, which was also filed with the NYSDHR, she met her

contractual requirement of filing a "legal action" within six months. *See id.* at 10-11. Finally,

Plaintiff contends that the Court should apply the continuing violation doctrine. *See id.* at 11-12.

Plaintiff contends that Defendant Beal's conduct began in November 2008 and continued to

escalate through December 2009. *See id.* at 12. Further, Plaintiff argues that, "[a]lthough the

final abusive incident took place in December 2009, Kennedy's ordeal with respect to FedEx's

sham investigation and subsequent response continued until April 29, 2010, the date that she was

forced to resign. . . . These facts necessitate the application of the continuing violation doctrine,

and permit Kennedy to bring all allegations dating back to November 2008 before a jury." *Id.* (internal citation omitted).

"'Although the Second Circuit has yet to definitively opine on the issue of whether the filing of a charge with the EEOC serves to automatically toll the statute of limitations on claims asserted under the NYSHRL and NYCHRL, numerous courts in this Circuit have held that the three-year statute of limitations applicable to claims under the NYSHRL and NYCHRL is tolled during the period in which a complaint is filed . . . with the EEOC.'" *Taylor v. City of New York*, No. 15-CV-7454, 2016 WL 4768829, *5 (S.D.N.Y. Sept. 13, 2016) (citing cases); *Esposito v. Deutsche Bank AG*, No. 07-CV-6722, 2008 WL 5233590, *5 (S.D.N.Y. Dec. 16, 2008) (citing cases); *Lee v. Overseas Shipping Corp.*, No. 00-CV-9682, 2001 WL 849747, *8 (S.D.N.Y. July 30, 2001); *Sloth v. Constellation Brands, Inc.*, 924 F. Supp. 2d 461, 474 (W.D.N.Y. 2013) (citations omitted).  Moreover, courts in the Second Circuit have also recognized that "State law claims are tolled while charges are pending before the EEOC, even if . . . the administrative charge was not actually dual-filed with the New York State Division of Human Rights." *Sloth*, 924 F. Supp. 2d at 474-75 (citations omitted).

Moreover, the New York State Court of Appeals has held that Human Rights Law claims are tolled during the pendency of a complaint filed with the State Division of Human Rights, *see Penman v. Pan Am. World Airways*, 69 N.Y.2d 989 (1987), and the New York State Appellate Division, Fourth Department, has confirmed that the tolling of Human Rights Law claims is extended to administrative complaints filed with the EEOC.  *See Martinez–Tolentino v. Buffalo State Coll.*, 277 A.D.2d 899 (4th Dep't 2000) (holding that Human Rights law "limitations' period was tolled beginning [on] the date on which plaintiff filed his complaint with the Equal Employment Opportunity Commission").

In the present matter, the Court first rejects FedEx's argument that filing her charge with the EEOC does not constitute "legal action" as that term appears in the Employment Agreement. *See* Dkt. No. 66 at 6. For this argument, FedEx relies on the case *Ray v. FedEx Corporate Services, Inc.*, 668 F. Supp. 2d 1063, 1070 n.2 (W.D. Tenn. 2009), to support its argument that filing a charge with the EEOC does not constitute "legal action." In *Ray*, the court summarily dismissed in a footnote, without citation to any relevant legal authority, the plaintiff's argument that filing with the EEOC constituted "legal action" as set forth in the employment contract. *See Ray*, 668 F. Supp. 2d at 1070 n.2 ("In essence, Plaintiff argues that if the Court had considered the EEOC Documentation during the pendency of Defendant's Motion for Summary Judgment, the Court would not have found Plaintiff's claim time-barred. On this point, the Court is not convinced. It does not appear that the filing of a charge with the EEOC constitutes 'legal action' as that term appears in the 'Employment Agreement' in this case"). Further, the court in *Ray* was denying the plaintiff's motion to alter or amend its judgment, after having granted the defendant's motion for summary judgment. *See id.* at 1069-70. The court determined that the EEOC documentation was not "newly discovered evidence" for purposes of Rule 59(e) and, therefore, the court declined to reconsider its summary judgment decision and did not fully consider the impact of filing with the EEOC. As such, the Court respectfully declines to follow this non-binding dicta.

Next, FedEx argues that the filing of Plaintiff's charge with the EEOC should not toll the statute of limitations applicable to her state law claims. *See* Dkt. No. 66 at 6. As discussed above, the courts in this circuit are split on this issue. FedEx contends that a recent case issued from the Second Circuit Court of Appeals, *Castagna v. Luceno*, 744 F.3d 254 (2d Cir. 2014), compels the Court to find that the statute of limitations for Plaintiff's NYSHRL claim was not

tolled by the filing of an EEOC charge. In *Castagna*, the Second Circuit held that "filing an

EEOC charge does not toll the limitations period for state-law tort claims, even if those claims

arise out of the same factual circumstances as the discrimination alleged in the EEOC charge." *Id.*

at 255. In arriving at this conclusion, the Second Circuit relied on the Supreme Court case of

*Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975), which held that the statute of

limitations for race discrimination claims under 42 U.S.C. § 1981 was not tolled while similar

Title VII claims were pending at the EEOC. *See id.* at 465-66. Significantly, the *Castagna* court

rejected the plaintiff's attempt to distinguish the *Johnson* case because it involved two federal

statutes, rather than a state and federal statute:

> "Despite Title VII's range and its design as a comprehensive
> solution for the problem of invidious discrimination in employment,
> the aggrieved individual clearly is not deprived of other remedies he
> possesses and is not limited to Title VII in his search for relief. The
> legislative history of Title VII manifests a congressional intent to
> allow an individual to pursue independently his rights under both
> Title VII and *other applicable state and federal statutes*."

*Castagna*, 744 F.3d at 258 (quoting *Johnson*, 421 U.S. at 459, 95 S. Ct. 1716) (emphasis in

original); *see also Oliver v. New York Telephone Co.*, No. 91-CV-179, 1993 WL 173471, *3

(W.D.N.Y. Mar. 31, 1993) ("Having chosen to pursue her claim in state court only, plaintiff was

not required to wait for the issuance of a Right to Sue letter prior to initiating suit in state court.

Nor can she now rely on the EEOC's issuance of a Right to Sue letter to make the filing of her

Complaint timely").

Thus, FedEx contends that *Castagna* suggests that Title VII does not toll the separate

statute of limitations applicable to claims under the NYSHRL. *See* Dkt. No. 66 at 6-7. However,

FedEx does not expressly address the operation of NYSHRL § 279(9). Some courts have held

that section 279(9) prohibits a party from filing a claim under the NYSHRL, even when the

charge is initially filed with the EEOC, since, under the Worksharing Agreement between the EEOC and the New York State Division, an administrative claim is technically pending before both the EEOC and the Division. *See, e.g., Martinez–Tolentino v. Buffalo State Coll.*, 277 A.D. 2d 899, 899 (4th Dep't 2000). Under New York law, a statute of limitations is tolled where the commencement of an action is prohibited by statute. *See* N.Y. C.P.L.R. § 204(a). Thus, because the language in NYSHRL § 297(9) prohibits filing a claim with the state court while that same claim is pending before the Division, section 204(a) of the CPLR arguably tolls the filing of the claim in state court while the claim is pending before the EEOC. Therefore, while *Castagna* holds that Title VII does not toll the statute of limitations for state tort claims based on the same set of facts, it does not necessarily follow that filing with the EEOC does not toll claims filed under the NYSHRL. *See* N.Y. Exec. Law § 297(9); N.Y. C.P.L.R. § 204(a); *see also Sharpe v. American Exp. Co.*, 689 F. Supp. 294, 302-03 (S.D.N.Y. 1988).

Based on the foregoing, the Court finds that Plaintiff's NYSHRL claims were tolled while her federal claims were pending before the EEOC. Accordingly, FedEx's motion for summary judgment on this ground is denied.

## C.     Title VII and NYSHRL Claims

As an initial matter, the Court notes that the same standard is used when analyzing Title VII and NYSHRL claims. *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citations omitted); *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (citation omitted). Discrimination claims under Title VII are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). It is the plaintiff's burden to establish a prima facie case of discrimination. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) (citation omitted); *Lewis v. Erie Cnty. Med. Ctr. Corp.*, 907 F. Supp.

2d 336, 346 (W.D.N.Y. 2012) (citation omitted). "To establish a prima facie case of gender discrimination under Title VII and the NYSHRL, a plaintiff must demonstrate: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances surrounding the employment action that give rise to an inference of discrimination." *Fahrenkrug v. Verizon Servs. Corp.*, ___ Fed. Appx. ___, 2016 WL 3448300, *2 (2d Cir. 2016) (citing *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106-07 (2d Cir. 1989)) (internal footnote omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 316 (2004) (holding that the *McDonnell Douglas* framework applies to discriminatory discharge claims brought pursuant to the NYSHRL) (citations omitted). Once established, a rebuttable presumption of discrimination arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *See Byrnie*, 243 F.3d at 102; *Lewis*, 907 F. Supp. 2d at 346.

### 1. *Faragher/Ellerth Affirmative Defense*

"Against employee claims of hostile work environment and constructive discharge, the employer may have recourse to the so-called *Faragher/Ellerth* affirmative defense." *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2006). "The defense comprises two elements: that (1) 'the employer exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior,' and (2) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 766, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)) (alteration in original). "However, the employer may only raise the defense if 'the

employee's supervisor took no "tangible employment action," which involves an official company act, against the employee.'" *Wilkins v. Time Warner Cable, Inc.*, 10 F. Supp. 3d 299, 310 (N.D.N.Y. 2014) (quoting *Ferraro*, 440 F.3d at 101). "'A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (quoting *Ellerth*, 524 U.S. at 761, 118 S. Ct. 2257). "Such an action 'requires an official act of the enterprise, a company act.'" *Id.* (quotation omitted). "'The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors.'" *Id.* (quotation omitted). Therefore, when a supervisor takes a tangible employment action against a subordinate, the employer is liable under the principles of agency law. *See Ellerth*, 524 U.S. at 762-63. However, where a supervisor's harassment of a subordinate does not culminate in a tangible employment action, it is "less obvious" that the employer should be liable for the supervisor's acts. *See id.* at 764.

Both *Faragher* and *Ellerth* involved Title VII disparate treatment claims in which the alleged adverse employment action was a hostile work environment. *See Faragher*, 524 U.S. at 780; *Ellerth*, 524 U.S. at 752. "A claim for hostile work environment requires the plaintiff to show discriminatory conduct that was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Ferraro*, 440 F.3d at 100 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). *Pennsylvania State Police v. Suders* extended *Faragher/Ellerth* to compound hostile-environment constructive discharge claims — claims that a hostile work environment created "working conditions so intolerable that a reasonable person would have felt compelled to resign."

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-47 (2004); *Wilkins*, 10 F. Supp. 3d at 311 (citation omitted).

### *2. Hostile Work Environment*

Title VII makes it "'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)). "[T]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent "'to strike at the entire spectrum of disparate treatment of men and women"' in employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (quoting *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)). In order to demonstrate a hostile work environment based on gender, a plaintiff must establish: "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)); *see also Harris*, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview"); *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117-18 (2d Cir. 2010).

The inquiry has objective and subjective elements: "'the misconduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that environment to be abusive.'" *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (quoting *Alfano*, 294 F.3d at 374). Factors such as frequency of the

discriminatory conduct, its severity, and whether it humiliates or physically threatens an

employee or unreasonably interferes with an employee's work performance are used to determine

whether an environment is sufficiently hostile. *Id.* (citing *Harris*, 510 U.S. at 23). "As a general

rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in

order to be deemed pervasive.'" *Alfano*, 294 F.3d at 374 (quoting *Perry*, 115 F.3d at 149).

"Finally, it is 'axiomatic' that in order to establish a sex-based hostile work environment under

Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Id.* (quoting

*Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

　　　"In assessing the 'totality of the circumstances' offered to prove a hostile work

environment, a fact-finder may consider only abusive conduct proven to be 'based on sex.'"

*Pucino*, 618 F.3d at 117 (quotation and other citation omitted). "This may be proven by

'harass[ment] in such sex-specific and derogatory terms . . . [as] to make it clear that the harasser

is motivated by general hostility to the presence of women in the workplace,' . . . or by offering

'some circumstantial or other basis for inferring that incidents sex-neutral on their face were in

fact discriminatory.'" *Id.* at 117-18 (internal quotations omitted). "A plaintiff may rely on

incidents of sex-based abuse to show that other ostensibly sex-neutral conduct was, in fact,

sex-based." *Id.* at 118 (citation omitted); *see also Howley v. Town of Stratford*, 217 F.3d 141, 156

(2d Cir. 2000) (holding that a rational jury could infer that facially-neutral abuse was sex-based

because the perpetrator had previously made several sexually-derogatory statements).

　　　In the present matter, FedEx concedes that, for purposes of this motion, that the alleged

conduct of Defendant Beal, who was Plaintiff's supervisor, created a hostile work environment.

*See* Dkt. No. 51-2 at 16. FedEx argues, however, that it is entitled to summary judgment on this

claim because Plaintiff has failed to set forth a basis to impute liability for Defendant Beal's

conduct onto FedEx. *See id.* (citing *Mack*, 326 F.3d at 122). Specifically, FedEx argues that it is entitled to summary judgment on the basis of the *Faragher/Ellerth* affirmative defense. Plaintiff, however, argues that "FedEx is precluded from using the *Faragher/Ellerth* defense because Beal's harassing conduct, as well as the sham investigation and response of Altavilla and Accorso, culminated in three tangible employment actions: (1) *quid pro quo* harassment; (2) Kennedy's transfer to the Syracuse Ramp; and (3) Kennedy's constructive discharge." Dkt. No. 57 at 22. The Court will address each of Plaintiff's claims in turn.

### a. Constructive Discharge

Plaintiff contends that she was constructively discharged, which constituted a tangible employment action. *See* Dkt. No. 57 at 24-26. Plaintiff claims that "any reasonable factfinder could conclude that [Plaintiff's] working conditions in April of 2010 would be beyond 'intolerable' if she were forced to work alongside the man who raped her twice." *Id.* at 24 (citing *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 301 (S.D.N.Y. 2011)). Plaintiff claims that these intolerable working conditions "were created by both Beal, who raped her, *and* by Altavilla and Accorso, who deliberately and willfully conducted a botched sham of an investigation aimed at protecting Beal and the Syracuse Station. Beal, Altavilla and Accorso all played a role in Kennedy's constructive discharge which constitutes a tangible employment action under these circumstances." *Id.* at 24-25 (citing *Penn St. Police v. Suders*, 542 U.S. 129 (2004); *Bauers-Toy v. Clarence Central School Dist.*, 2014 WL 1745934, at *28 (W.D.N.Y. April 30, 2014)) (emphasis in original).

In *Suders*, the Supreme Court held that a constructive discharge is a "tangible employment action" such that "an employer does not have recourse to the *Ellerth/Faragher* affirmative defense when a supervisor's official act precipitates the constructive discharge." *Suders*, 542 U.S.

27

at 140-41.  Contrary to Plaintiff's position, however, the Supreme Court did not preclude an employer from asserting the affirmative defense in the present matter.  In *Suders*, the Supreme Court cited two circuit decisions with approval.  *See id.* at 149-50.  The Supreme Court summarized these decisions as follows:

> In *Reed v. MBNA Marketing Systems, Inc.*, 333 F.3d 27 (C.A.1 2003), the plaintiff claimed a constructive discharge based on her supervisor's repeated sexual comments and an incident in which he sexually assaulted her.  The First Circuit held that the alleged wrongdoing did not preclude the employer from asserting the *Ellerth/ Faragher* affirmative defense.  As the court explained in *Reed*, the supervisor's behavior involved no official actions.  Unlike, "*e.g.*, an extremely dangerous job assignment to retaliate for spurned advances," 333 F.3d, at 33, the supervisor's conduct in *Reed* "was exceedingly unofficial and involved no direct exercise of company authority"; indeed, it was "exactly the kind of wholly unauthorized conduct for which the affirmative defense was designed," *ibid.*  In contrast, in *Robinson v. Sappington*, 351 F.3d 317 (C.A.7 2003), after the plaintiff complained that she was sexually harassed by the judge for whom she worked, the presiding judge decided to transfer her to another judge, but told her that "her first six months [in the new post] probably would be 'hell,'" and that it was in her "'best interest to resign.'"  *Id.*, at 324.  The Seventh Circuit held that the employer was precluded from asserting the affirmative defense to the plaintiff's constructive discharge claim.  The *Robinson* plaintiff's decision to resign, the court explained, "resulted, at least in part, from [the presiding judge's] official actio[n] in transferring" her to a judge who resisted placing her on his staff.  *Id.*, at 337.  The courts in *Reed* and *Robinson* properly recognized that *Ellerth* and *Faragher*, which divided the universe of supervisor-harassment claims according to the presence or absence of an official act, mark the path constructive discharge claims based on harassing conduct must follow.

*Suders*, 542 U.S. at 149-50.

Although the caselaw is clear that a constructive discharge may serve as a tangible employment action that would preclude an employer from taking advantage of the *Ellerth/Faragher* affirmative defense, such is not the case in the present matter.  It is undisputed that Defendant Beal's inappropriate conduct, culminating in the alleged rape, constituted

unofficial conduct. Plaintiff has put forth no evidence that Defendant Beal's actions constituted official action in his capacity as a supervisor for FedEx. Rather, his conduct represented repulsive conduct without the presence of an official act.

In her response to the pending motion, Plaintiff argues that she "was subjected to non-consensual sexual advances and physical assaults by Beal, including two brutal sexual assaults . . . When she reported her concerns to Accorso and Altavilla, they staged a sham insular investigation, which was tainted by their own interests." Dkt. No. 57 at 25 (citing Dkt. No. 58 at ¶¶ 26, 27, 29-31, 50, 56, 58-68, 72-79, 110-118, 127-128, 130-136). Further, Plaintiff contends that they "willfully ignored their own business records, refused to interview key witnesses, and disregarded evidence that Kennedy and Beal were at the Station on the dates when the rapes occurred." *Id.* at 25-26 (citing Dkt. No. 58 at ¶¶ 50, 56, 58-68, 72-79). Finally, Plaintiff contends that, "[u]ltimately, their actions created intolerable working conditions for Kennedy and forced her to resign." *Id.* at 26 (citation omitted). Plaintiff argues that this "constructive discharge, at the hands of Beal, Accorso and Altavilla, is a tangible employment action that bars application of *Faragher/Ellerth* and precludes summary judgment." *Id.*

Contrary to Plaintiff's allegations, nothing in the record supports her allegations. Although Plaintiff alleges that the investigation was a sham and that Accorso and Altavilla were "tainted by their own interests," the record paints a very different picture. Rather, the record demonstrates that, as soon as Plaintiff informed Accorso of Defendant Beal's conduct, immediate action was taken. On the night of February 1, 2010, Plaintiff called Accorso and left a message for her to return her call. *See* Dkt. No. 58 at ¶ 46. Accorso called her back within minutes "and while the two did not discuss Kennedy's allegations in great detail during this call, Kennedy reported that Beal was harassing her." *Id.* at ¶ 47. At this point, Accorso immediately contacted

Altavilla and another HR manager.  *See id.* at ¶ 49.  Accorso called Plaintiff a second time that evening and directed her to not go to work the following day at the Syracuse Station but to meet her at the Syracuse Ramp instead.  *See id.* at ¶ 51.

Upon interviewing both Plaintiff and Defendant Beal on February 2, 2010, Defendant Beal was immediately suspended pending investigation.  *See id.* at ¶ 57.  This action was taken despite the fact that Defendant Beal denied the allegations leveled against him.  *See id.*  On February 3, 2010, Accorso and Altavilla went to the Syracuse Station to continue their investigation.  *See id.* at ¶ 58.  Although Plaintiff was unable to identify any witnesses who may have observed the alleged conduct, Accorso and Altavilla interviewed anyone they believed might have knowledge of the situation.  *See id.*  As part of their investigation, Accorso and Altavilla interviewed the three other Operations Managers at the Syracuse Station – Cindy Smith, Mike Venezia, and Mitch Cornish – as well as the Operations Manager at the Watertown Station, Michelle McGrann.  *See* Dkt. No. 58 at ¶ 59.  According to Accorso, questions were posed to these managers about their interactions and relationship with Defendant Beal, contact with Beal outside of work, the length and frequency of one-on-one meetings they had with Beal, their observations of Beal's meetings with other managers, if they had ever received complaints from anyone about feeling uncomfortable in the work environment, whether they had witnessed or perceived discrimination, and whether Beal had ever made any remarks about women they considered to be inappropriate.  *See* Dkt. No. 51-4 at ¶ 14.

Accorso also interviewed Donna Talarico, a Service Assurance Agent who had an office that connected with Beal's; Kelley Mathewson, a Service Assurance Manager at the Syracuse Station who frequently had contact with Beal due to the nature of her job and who was in touch with the "rumor mill;" and Mary Maglione, a female employee who had previously lived with

30

Plaintiff and with whom Plaintiff may have shared concerns. *See* Dkt. No. 58 at ¶ 61; Dkt. No. 51-4 at ¶ 15; Dkt. No. 51-5 at 31-35. They were questioned about their interactions with Defendant Beal and whether they were aware of any managers who were uncomfortable around him. *See id.* According to Accorso, while her investigation did reveal that Plaintiff may have spent more time in Defendant Beal's office than other managers, none of the employees and managers interviewed offered any information that corroborated or substantiated Plaintiff's claims of sexual harassment. *See* Dkt. No. 58 at ¶ 62; Dkt. No. 51-4 at ¶ 16. Moreover, Accorso conducted a review of cell phone records because Plaintiff claimed that Defendant Beal had called her on her personal cell phone. *See id.* at ¶ 63; Dkt. No. 51-4 at ¶ 16. Accorso concluded that Plaintiff had provided Defendant Beal with her personal cell phone number; and, while Defendant Beal called Plaintiff twenty (20) times over an eight (8) month period, Plaintiff called Defendant Beal from her personal cell phone nine (9) times during that same time period. *See* Dkt. No. 58 at ¶ 64; Dkt. No. 51-5 at 72-73.

During her investigation, Accorso also contacted FedEx's HR Compliance Department to determine if any other similar complaints had been made against Defendant Beal. *See id.* at ¶ 65; Dkt. No. 51-5 at 12-14. According to Accorso, while one other complaint against Defendant Beal was on file, the HR Compliance Department informed her that it was not similar in nature to the sexual harassment allegations made by Plaintiff. *See id.* at ¶ 66; Dkt. No. 51-5 at 15.

Despite this investigation, Accorso and Altavilla were not able to substantiate the allegations against Defendant Beal. Moreover, this comprehensive investigation was undertaken despite the fact that Plaintiff had withheld the most serious of her allegations, *i.e.*, the two incidents of non-consensual sex. In fact, Plaintiff did not inform Accorso of this allegation until March 2, 2010, one month after she initially reported the alleged harassment. *See* Dkt. No. 58 at

¶ 70.  Defendant Beal, who was still suspended, was interviewed by Accorso and Altavilla for a third time shortly after Plaintiff raised her additional allegations.  *See id.* at ¶ 78.

Although Plaintiff repeatedly takes issue with the scope of the investigation, it is unclear how such a thorough investigation could have caused her alleged constructive discharge by creating a hostile work environment.  Nothing about Accorso or Altavilla's conduct could be considered a tangible employment action.  Moreover, although they were unable to corroborate the allegations, Plaintiff was offered a lateral transfer to the Syracuse Ramp, which would have removed her from working in a position in which Defendant Beal was her direct supervisor.

The undisputed facts clearly demonstrate that there was "no official act of the enterprise," no "final straw" by Defendant Beal exercising his managerial authority to the disadvantage of Plaintiff in April 2010.  Further, the actions of Accorso and Altavilla were taken to promptly investigate Plaintiff's allegations and remedy the situation, not to force her to resign.  The allegations and evidence in the present matter clearly demonstrate that this was "'exactly the kind of wholly unauthorized conduct for which the affirmative defense was designed[.]'"  *Suders*, 542 U.S. at 149-50 (quotation omitted); *see also Lukewitte v. Gonzales*, 436 F.3d 248, 253-54 (D.C. Cir. 2006) ("There is no evidence anywhere in the record to support appellant's assertion that Ehemann implicitly threatened her with a loss of job, demotion, or other tangible employment action if she declined to submit to his advances.  Ehemann's harassing conduct was unspeakably offensive and repulsive, but the coercion that is inherent in a supervisor-employee relationship, without more, is not enough upon which to hold an employer strictly liable for a supervisor's sexual harassment").  While Defendant Beal's conduct, considering the evidence in the light most favorable to Plaintiff, was unquestionably sufficient to create a hostile work environment, the

undisputed facts clearly demonstrate that no official act by FedEx constituted a tangible employment action.

Accordingly, the Court finds that FedEx is not precluded from benefitting from the *Faragher/Ellerth* affirmative defense based on Plaintiff's claimed constructive discharge.

### b. *Quid Pro Quo Harassment*

Plaintiff contends that Defendant Beal's *quid pro quo* harassment was a tangible employment action. *See* Dkt. No. 57 at 22-23. FedEx, however, contends that Plaintiff failed to allege a *quid pro quo* theory of recovery in her complaint and the Court should not permit such a theory to be raised for the first time at summary judgment. *See* Dkt. No. 66 at 7-8. Further, FedEx argues that, to the extent that the Court may be included to consider this theory, Plaintiff's claim should still be dismissed because she has failed to meet the requirements for *quid pro quo* harassment. *See id.* at 8.

The Court agrees with FedEx that Plaintiff failed to plead *quid pro quo* harassment in her complaint and, therefore, the legal theory is not properly before the Court. *See Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 413 (S.D.N.Y. 2012). Although Plaintiff was not required to specifically use the words "*quid pro quo*" in her complaint to plead such a claim, she failed to plausibly allege facts suggesting that she was asserting such a claim. *See Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 604 (2d Cir. 2006).

Moreover, even if Plaintiff did plead such a cause of action, the Court nevertheless finds that FedEx is entitled to summary judgment on the claim. In *Ellerth*, the Supreme Court held that the *Faragher/Ellerth* defense is available to an employer when a supervisor creates a hostile work environment, even if he or she makes explicit threats to alter a subordinate's terms or conditions of employment as long as those threats are not fulfilled. *See Ellerth*, 524 U.S. at 753-54; *see*

*also Schiano*, 445 F.3d at 604 ("'When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII.' . . . If, however, a 'claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct'") (quoting *Ellerth*, 524 U.S. at 753-54). Although Defendant Beal may have had authority to review Plaintiff's performance and affect her retention or termination and made comments such as "'if you take care of me, I'll take care of you,'" Plaintiff fails to provide any evidence that Defendant Beal actually took an identifiable step to inflict a tangible employment action on Plaintiff. Simply having the ability to take such an action is insufficient. *See Finnerty v. William H. Sadlier, Inc.*, 176 Fed. Appx. 158, 162 (2d Cir. 2006) (noting that the plaintiff "did not contend that [her supervisor] explicitly threatened her with termination or otherwise formally altered or threatened to alter her job responsibilities if she did not submit to his advances" and, therefore, "[t]here is no evidence from which a rational juror could conclude that [the plaintiff] suffered a tangible employment action as a result of [her supervisor's] alleged harassment"). Further, Plaintiff has not alleged and has failed to provide the Court with any evidence she was threatened with some adverse employment action, promised continued employment, or provided a job benefit by Defendant Beal. *See Holly D. v. California Institute of Technology*, 339 F.3d 1158, 1169 (9th Cir. 2003). Without such allegations/evidence, Plaintiff has failed to create a question of fact regarding whether there was a "tangible employment action" for purposes of Title VII. *See id.*

Plaintiff alleges in her response to Beal told her "and others that he is the first to know if a complaint has been filed." Dkt. No. 58 at ¶ 93. According to Plaintiff, she had an issue with an

employee and "needed to inquire with [her] manager or personnel about what to do; and he was in a meeting, so I inquired with Sheila [Accorso]." Dkt. No. 58-1 at 9. Plaintiff claims that, after she did this, Beal told her that she should have discussed the issue with him and stated that "everything that happens in our station stays in our station." *Id.* As such, the testimony makes clear that Beal did not threaten Plaintiff, as she seems to imply, but simply instructed her to bring issues she has with her subordinates to him before going to bringing them to the attention of Accorso. *See id.* at 9-11. Further, Plaintiff seems to imply that Beal threatened her when he indicated that he is the first to know when a complaint is filed. It goes without saying that, if an employee filed a complaint of sexual harassment against Beal with personnel, he would undoubtedly know about it since any investigation would necessarily require him to be interviewed.

Significantly, Plaintiff has not alleged or put forth any evidence that Defendant Beal conditioned her continued employment or granted her other employment benefits in return for her submission to unwanted sexual acts. Without such allegations, an employer is not stripped of the protections offered by the *Faragher/Ellerth* affirmative defense. *See Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 94-95 (2d Cir. 2002).

Accordingly, the Court finds that Plaintiff's allegations of *quid pro quo* harassment do not preclude FedEx from taking advantage of this affirmative defense.

### c. Transfer to the Syracuse Ramp

Plaintiff also contends that FedEx's offer to transfer her to the Syracuse Ramp was a tangible employment action. *See* Dkt. No. 57 at 23-24. According to Plaintiff, "FedEx boldly characterizes [Plaintiff's] reassignment to the Ramp as an 'opportunity' when she was in fact forced by FedEx to either accept what she felt was a demotion or return to work with the man

who raped her." *Id.* at 23. Plaintiff contends that this reassignment came with significantly different responsibilities and, therefore, is a tangible employment action. *See id.* (citing *Ellerth*, 524 U.S. at 761). Plaintiff asserts that such a move would have forced her "to transfer from its ground delivery operation to its air delivery operation." *Id.* at 23-24 (citing Dkt. No. 58 at ¶¶ 138, 141). According to Plaintiff, had she accepted the transfer, she "would have had to forgo 13 years of professional training in ground operations, and orient herself with a new division of FedEx." *Id.* at 24. FedEx, however, contends that Plaintiff's argument "ignores the fact that no transfer actually occurred. It was simply an option offered to [Plaintiff] which she could – and did – voluntarily decline." Dkt. No. 66 at 9.

As FedEx correctly contends, the undisputed facts make clear that the offer to transfer Plaintiff to the Syracuse Ramp was not a tangible employment action for purposes of this claim. As Plaintiff admits, FedEx offered to transfer her to the Syracuse Ramp, which was a lateral transfer in which she would have continued to serve as an Operations Manager. *See* Dkt. No. 58 at ¶¶ 86-87. Although Plaintiff contends that this offer constituted a "tangible employment action," she fails to explain why such an offer would constitute a tangible employment action and further fails to cite to any authority in support of her position. In *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 108 (E.D.N.Y. 2011), the court found that a suggestion that the plaintiff transfer to a different position or even a plan to transfer the plaintiff did not constitute a tangible employment action because the transfer never actually occurred. *See also Duhe v. U.S. Postal Service*, No. 03-cv-746, 2004 WL 439890, *11 (E.D. La. Mar. 9, 2004) (holding that because the plaintiff "was simply offered a lateral transfer in an attempt to remedy the harassment, and she was subject to no adverse consequences for rejecting that offer, [she] cannot raise any genuine issue of material fact with respect to whether a 'tangible employment action' or

'constructive discharge' occurred"); *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1300 (11th Cir. 2007) (holding that an "offer to transfer an employee . . . is not an employment action; it is merely an offer").

Further, even if such an offer to transfer Plaintiff to the Syracuse Ramp could be considered a tangible employment action, the action was "not part of the supervisor's discriminatory harassment." *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2006) (citations omitted). As Plaintiff admits, the offer to laterally transfer Plaintiff was made by Accorso on March 12, 2010, after Defendant Beal had been placed on leave and immediately following the conclusion of Accorso's investigation. *See* Dkt. No. 58 at ¶¶ 86-87. As such, Defendant Beal had nothing to do with this offer and clearly the offer was not part of the "supervisor's discriminatory harassment." *Ferraro*, 440 F.3d at 101.

Based on the foregoing, the Court finds that FedEx's offer to transfer Plaintiff to the Syracuse Ramp did not constitute a tangible employment action.

### d. Faragher/Ellerth

Since Plaintiff did not suffer an adverse employment action, FedEx may avail itself of the *Faragher/Ellerth* affirmative defense. *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2006). As mentioned, the "defense comprises two elements: that (1) 'the employer exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior,' and (2) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Id.* at 101 (quotations omitted).

In opposition to FedEx's motion, Plaintiff contends that FedEx has failed to establish that it exercised reasonable care to prevent or correct Defendant Beal's harassment. *See* Dkt. No. 57 at

26.  According to Plaintiff, "[w]hile it is undisputed that FedEx had an anti-harassment policy, the mere existence of a policy is not dispositive.  Rather, summary judgment must be denied where, as here, 'a genuine issue of fact exist[ed] as to whether [the employer's policy] had force.'"  *Id.* at 26-27 (citing cases).  Plaintiff argues that the "sham investigation conducted by Altavilla and Accorso cannot satisfy FedEx's burden.  Following Kennedy's complaint, Altavilla and Accorso refused to interview any witnesses outside the company, including Kennedy's therapist, who could have corroborated her complaint.  Instead, Altavilla and Accorso only interviewed FedEx employees, who could not have witnessed the harassing and abusive behavior that took place behind closed, often locked, doors while Beal was alone with Kennedy."  *Id.* at 27 (citing Dkt. No. 58 at ¶¶ 58-62).  Further, Plaintiff contends that, on March 3, 2010 she informed Accorso that Defendant Beal raped her on August 23, 2009 and September 27, 2009 and, despite them being made aware of this "egregious and brutal conduct, Altavilla and Accorso willfully and deliberately continued their botched investigation."  *Id.*

Contrary to Plaintiff's allegations, FedEx has established that it exercised reasonable care to prevent and correct promptly the alleged harassing behavior.  It is well-established in the Second Circuit that an employer can establish that it exercised reasonable care to prevent harassing behavior by demonstrating that it adopted and disseminated an anti-harassment policy that provides multiple avenues through which a complaint can be made.  *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 128 (2d Cir. 2003), *abrogated in part on other grounds by Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013); *see also Ferraro*, 440 F.3d at 102-03.  This is true even if the policy is ultimately unsuccessful in preventing the harassment.  *See id.*  In the present matter, the undisputed facts demonstrate that FedEx had a comprehensive Anti-Harassment Policy in place that was available at all times.  *See* Dkt. No. 58 at ¶¶ 1-5, 9-16, 23.  FedEx's Anti-

Harassment Policy, as well as its EEO Complaint Process, identifies the various individuals and department to whom complaints can be made and advises employees that retaliation is prohibited. *See id.* FedEx even maintains a toll-free alert line that employees can use to make anonymous complaint. *See id.* at ¶ 4. Plaintiff, who was an Operations Manager for thirteen years, participated in multiple training sessions regarding these procedures. *See id.* at ¶¶ 7-8. Accordingly, the undisputed facts establish that FedEx had a comprehensive anti-harassment policy in place that was reasonably calculated to prevent and correct any such harassment.

Moreover, the undisputed facts clearly demonstrate that Accorso and Altavilla conducted a thorough investigation and that FedEx acted promptly to correct the alleged harassing behavior. Plaintiff argues that their investigation was a sham because they did not conduct a more thorough analysis of her computer to determine that she was at the Syracuse Station on the dates in question. However, FedEx never disputed that Plaintiff was present in the Station on the two Sundays at issue. According to the testimony, Altavilla and Accorso assumed this fact for purposes of their investigation, which was based on Plaintiff's statements and was consistent with Station access information they obtained from the security system. *See* Dkt. No. 58 at ¶ 73. Further, although Plaintiff contends that Accorso should have contacted her counselor, Plaintiff does not contend that she asked Accorso to do so. Plaintiff's counselor did not witness any interactions between Plaintiff and Defendant Beal and could offer no physical proof to support Plaintiff's claims. Moreover, the undisputed facts demonstrate that Plaintiff did not see this counselor at all between September 16, 2008 and February 16, 2010. *See* Dkt. No. 66-1 at ¶ 121. Further, Plaintiff did not inform Accorso that she was seeing a counselor until February 25, 2010. *See* Dkt. No. 66-1 at ¶ 127. Moreover, Plaintiff testified that she did not provide this information because she assumed that FedEx would discover this fact during its investigation.

In an entirely conclusory manner, Plaintiff has objected to perceived flaws in FedEx's response to her allegations. However, the undisputed facts demonstrate that, as soon as Plaintiff first reported the alleged harassment (but not the alleged rape) Accorso and/or Altavilla responded in the following manner: (1) immediately separated Plaintiff and Beal; (2) met with Plaintiff in person the following day, on February 2, 2010, at an off-site location to discuss her allegations; (3) requested that Plaintiff complete an internal EEO form; (4) interviewed Beal that same day, February 2, 2010, and placed him on suspension; (5) over the course of the next several days, interviewed all potential witnesses who could potentially have knowledge of the situation, including all of the managers reporting to Beal, since Plaintiff could not identify any particular witness herself; (6) obtained and reviewed Plaintiff's and Beal's cell phone records; (7) contacted FedEx's HR Compliance Department to determine if any similar complaints against Beal had been made in the past; (8) re-interviewed Beal and Plaintiff; (9) interviewed Plaintiff a third time on March 2, 2010, immediately after Plaintiff added allegations of rape to her claims; (10) checked with FedEx's security personnel to determine if any useful video footage form the Syracuse Station was available for review; (11) reviewed the results of a forensic computer examination conducted by FedEx's internal IT personnel; (12) confirmed that Plaintiff was present at the Syracuse Station on August 23 and September 27, 2009 by reviewing the Station's access information; and (13) interviewed Beal a third time. *See* Dkt. No. 51-1 at ¶¶ 51-53, 56-67, 70-71, 74-78.

In *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287 (11th Cir. 2007), the plaintiff challenged how the defendant investigated her claims of sexual harassment. *See id.* at 1303-04. Rejecting the plaintiff's claims that the investigation was unreasonable, the court noted that a "threshold step in correcting harassment is to determine if any occurred, and that requires

an investigation that is reasonable given the circumstances. The requirement of a reasonable investigation does not include a requirement that the employer credit uncorroborated statements the complainant makes if they are disputed by the alleged harasser. Nothing in the *Faragher-Ellerth* defense puts a thumb on either side of the scale in a he-said, she-said situation. The employer is not required to credit the statements on the she-said side absent circumstances indicating that it would be unreasonable not to do so." *Id.* Further, the court noted that the Supreme Court has not required companies to conduct "full-blown, due process, trial-type proceeding in response to complaints of sexual harassment" for the response to be considered reasonable. *Id.* at 1304. "All that is required of an investigation is reasonableness in all of the circumstances, and the permissible circumstances may include conducting the inquiry informally in a manner that will not unnecessarily disrupt the company's business, and in an effort to arrive at a reasonably fair estimate of truth." *Id.* (citing *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1012 (7th Cir. 1994)).

Similarly, in *Christian v. AHS Tulsa Regional Medical Ctr., LLC*, 430 Fed. Appx. 694 (10th Cir. 2011), the court similarly rejected the plaintiff's contention that the defendant's investigation was unreasonable because the plaintiff's statements were discredited, certain employees were not interviewed, a prior complaint against the supervisor was not adequately investigated, the alleged harasser was not suspended during the investigation, and a second investigation was not launched into events that took place after the plaintiff's first complaint. *See id.* at 699. Indeed, the Tenth Circuit concluded that the defendant's investigation was reasonable because it was promptly undertaken and interviews were conducted of the plaintiff, the alleged harasser, and other employees who may have witnessed the alleged events. *See id.*

As courts have found, the reasonableness of an investigation is not controlled by the investigation's ultimate finding of whether sexual harassment occurred or not. *See Baldwin*, 480 F.3d at 1303-04; *see also Terry v. Laurel Oaks Behavioral Health Ctr., Inc.*, 1 F. Supp. 3d 1250, 1272 (M.D. Ala. 2014) (citation omitted). Although Plaintiff is understandably disappointed with the result of the investigation and the fact that Beal did not receive harsher discipline, "corrective action does not always require discipline" of the offending harasser. *Terry*, 1 F. Supp. 3d at 1272-73 (citation omitted); *see also Debord v. Mercy Health Sys. of Kansas, Inc.*, 737 F.3d 642, 654 (10th Cir. 2013); *Smith v. America Online, Inc.*, 499 F. Supp. 2d 1251, 1265 (M.D. Fla. 2007) (holding that the employer-defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior where the employer maintained a sexual harassment policy which provided alternative avenues for reporting should employee be harassed, Human Resources Director interviewed both subordinate and supervisor on day she learned of subordinate's complaints concerning supervisor and determined that, because subordinate could not corroborate any of her claims and supervisor denied them, nothing other than verbal warning to supervisor was appropriate, and even if investigation was defective the remedial result was reasonable where supervisor was told that if there were any more complaints about him, he would be subject to formal discipline up to and including termination).

As FedEx correctly asserts, the investigation and response undertaken in the present matter was considerably more comprehensive than what was found to be reasonable in *Baldwin* and *Christian*. Plaintiff's conclusory objections to the investigation that was undertaken are insufficient to create a question of fact as to this issue. Accordingly, the Court finds that FedEx has satisfied this first prong of the *Faragher/Ellerth* defense. Further, the Court finds that, in the alternative, FedEx has met its burden by establishing that they offered appropriate remedial

measures. As the undisputed facts demonstrate, Plaintiff could have accepted a lateral transfer to the Syracuse Ramp or could have remained at the Syracuse Station where Human Resources would have monitored Beal's interactions with her. *See* Dkt. No. 58 at ¶¶ 86-89. Additionally, as discussed above, Beal was counseled and was required to re-attend sexual harassment training before he was permitted to return to work. *See id.* at ¶¶ 80-81. Such remedial measures have been found sufficient in factual similar situations. *See Baldwin*, 480 F.3d at 1305-06 (citing cases). Although Plaintiff may have preferred Beal to be terminated or transferred, the law does not require FedEx to provide Plaintiff with the specific remedy she wants, so long as the remedy offered is an effective one. *See Gonzalez v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 355 (S.D.N.Y. 2003) ("An employer's remedy need not necessarily expel the harasser from the work environment to be effective, but rather it should be 'sufficiently calculated to end the harassment'"). Under similar circumstances, courts have found that the employer responded reasonably. *See Finnerty*, 176 Fed. Appx. at 162; *Cajamacara v. Regal Entertainment Group*, 863 F. Supp. 2d 237, 250 (E.D.N.Y. 2012). As such, the Court finds that FedEx has satisfied its burden under the first prong of the *Faragher/Ellerth* defense.

As to the second prong, the Second Circuit has adopted a "burden shifting approach." Once the employer has demonstrated that the plaintiff failed to avail herself of the complaint procedure, the burden of proof shifts to the employee to come forward with an explanation why she did not make use of the procedures. *See Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 208 (N.D.N.Y. 2002). Defendant may carry that burden by introducing evidence that plaintiff failed to avail herself of the defendant's complaint procedure and then may rely on the absence or inadequacy of plaintiff's justification for that failure. *See Ferraro*, 440 F.3d at 103 (finding that the record contained no evidence of any other complaints against the harasser under the complaint

procedure).  Fear or reluctance to report based upon the belief that the plaintiff would suffer adverse employment action or be ignored must be credible.  *See Leopold*, 239 F.3d at 246.  The plaintiff must produce evidence that the employer ignored or resisted similar complaints or took adverse action against employees in response to complaints.  *See id.*  Speculative and unsubstantiated reasons for not reporting harassment are not recognized as valid excuses.  *See id.* at 245 (finding that the plaintiff did not come forward with evidence but merely asserted that she was apprehensive about speaking up for fear of being fired because a co-worker's vague complaint was not seriously considered); *see also id.* at 246 (holding that the plaintiff's concern that she would be fired for speaking up and her general claim that a co-worker's vague and ambiguous complaint was not taken seriously were insufficient to prove that the plaintiff's fear was credible).

In the present matter, the Court finds that, by waiting more than one year after the alleged harassment began, more than seven months after it progressed to inappropriate touching, and more than five months after the first incident of alleged rape to report any of this alleged conduct to FedEx, Plaintiff unreasonably failed to take advantage of the preventive and corrective opportunities provided by FedEx.  As discussed, Plaintiff was a manager for FedEx for more than ten years.  *See* Dkt. No. 58 at ¶ 6.  She was trained multiple times on FedEx's anti-harassment policies and it was her responsibility as a manager to enforce this policy.  *See id.* at ¶¶ 7-16, 21, 41.  Plaintiff knew by June of 2009 when the touching began that Beal's conduct violated FedEx's policy, and she knew that she had an obligation to report such violations.  *See id.* at ¶ 32 ("Kennedy admits that having been a manager for over ten years, she knew Beal's physical touching of her violated FedEx policy, knew that it was her responsibility as a manager to ensure that FedEx policies and procedures were followed, and knew that she had an obligation to report

violations of FedEx policy").  The touching the Plaintiff described as occurring in June of 2009 and thereafter was not insignificant.  Plaintiff claims that Beal squeezed her breasts, attempted to reach up her skirt, kissed her, and placed her hand on his genitals.  *See* Dkt. No. 58 at ¶¶ 30-31.  Plaintiff admits that Human Resources would have been required "to do something about it" if she reported the conduct.  *See id.* at ¶ 37.  Plaintiff admits that no one threatened her; and no one, including Beal, ever told her not to complain.  *See id.* at ¶ 92.

As FedEx correctly notes, a failure to timely complain can amount to a complete failure to utilize complaint procedures in the absence of a "credible fear" regarding what might happen to the employee if the complaint is made.  *See Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 209 (N.D.N.Y. 2002); *Walton v. Johnson*, 347 F.3d 1272, 1290 (11th Cir. 2003).  Further, courts have found that a reporting delay of equal and even less magnitude is unreasonable as a matter of law.  *See Pinkerton v. Colorado Dep't of Transportation*, 563 F.3d 1052, 1063-64 (10th Cir. 2009) (holding that the approximately two month delay was unreasonable where the plaintiff received harassment training and knew the incidents should have been reported); *Thornton v. Federal Express Corp.*, 530 F.3d 451, 457 (6th Cir. 2008) (finding that the two month delay in report sexual harassment was unreasonable); *Jackson v. County of Racine*, 474 F.3d 493, 502 (7th Cir. 2007) (finding four month delay unreasonable); *Baldwin*, 480 F.3d 1287, 1306-07 (11th Cir. 2007) (finding delay of three months and two weeks unreasonable).  Here, Plaintiff failed to report continually escalating conduct and, when asked why, she testified that she "didn't want to be judged," "didn't want to have an investigation," "didn't want to deal with it," was "embarrassed" because she knew that Accorso "would be obligated to do something about it" and she did not want to have to tell "everything that was going on."  Dkt. No. 58 at ¶¶ 32-33, 37, 39.  The Court has no doubt that Beal's conduct was emotionally and physically traumatizing and that

Plaintiff was embarrassed to report the conduct. Such allegations, however, are insufficient to excuse her reporting delay. *See Walton*, 347 F.3d at 1290 (holding that severe harassment can be "particularly traumatic" but "the problem of workplace discrimination . . . cannot be [corrected] without the cooperation of victims") (citations omitted). As the First Circuit has noted, "[r]eporting sexually offensive conduct by a supervisor would for many or most employees be uncomfortable, scary or both. But because this will often or ordinarily be true, as the Supreme Court certainly knew, its regime necessarily requires the employee in normal circumstances to make this painful effort if the employee wants to impose vicarious liability on the employer and collect damages under Title VII." *Reed v. MBNA Marketing Systems, Inc.*, 333 F.3d 27, 35 (1st Cir. 2003) (emphasis omitted).

The Second Circuit has stated, "there are many reasons why a victimized employee may be reluctant to report acts of workplace harassment, but for that reluctance to preclude the employer's affirmative defense, it must be based on apprehension of what the employer might do," specifically, on a "credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 2983 295 (2d Cir. 1999), *overruled on other grounds by In re IPO*, 471 F.3d 24 (2d Cir. 2006); *see also Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 270 (4th Cir. 2001) (holding that a "nebulous fear" of retaliation is not an adequate basis for remaining silent). Plaintiff has not presented anything other than her own conclusory allegations as to why she remained silent for so long. Plaintiff's own subjective fear, unsupported by any specific facts, are insufficient to create an issue of fact as to whether Plaintiff unreasonably failed to report the harassment.

The *Faragher/Ellerth* affirmative defense places a burden on both employers and employees to act responsibly and appropriately and the Supreme Court has noted that "[i]f the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided." *Faragher*, 524 U.S. at 807.

The Court notes that the defendant has the burden of proving its entitlement to the *Faragher/Ellerth* defense and summary judgment on this issue is only appropriate if "the evidence is so overwhelming that the jury could rationally reach no other result." *Fairbrother v. Morrison*, 412 F.3d 39, 53 (2d Cir. 2005), *abrogated in part on other grounds by Kessler v. Westchester Cnty. Dept. of Soc. Servs.*, 461 F.3d 199 (2d Cir. 2006). Resolving all ambiguities and drawing all inferences in Plaintiff's favor, the Court finds that FedEx is entitled to summary judgment on this claim.

Accordingly, the Court grants FedEx's motion for summary judgment as to Plaintiff's hostile work environment claim.

### 3. Gender Discrimination

FedEx contends that it is entitled to summary judgment as to Plaintiff's gender discrimination claim for several reasons. *See* Dkt. No. 51-2 at 11-16. First, FedEx argues that Plaintiff cannot establish a *prima facie* case because she did not suffer an adverse employment action under circumstances giving rise to an inference of discrimination. *See id.* at 12-15. Specifically, FedEx asserts that there "are no facts to support a finding that FedEx wanted [Plaintiff] to leave its employment and, therefore, deliberately made her working conditions so intolerable that she had no choice but to resign." *Id.* at 13. Rather, FedEx contends that Plaintiff

concedes that FedEx does not tolerate harassment and, "[a]s soon as FedEx was notified of [Plaintiff's] allegations in February 2010, it immediately suspended Beal and conducted an extensive and thorough investigation." *Id.* Further, FedEx argues that, even if the Court finds that Plaintiff suffered an adverse employment action, Plaintiff has failed to put forth any evidence showing that the actions taken occurred under circumstances giving rise to an inference of gender discrimination." *Id.* at 14. Finally, FedEx contends that even if the Court finds that Plaintiff has set forth a *prima facie* case, FedEx established that it had legitimate, non-discriminatory reasons for its decisions, which Plaintiff cannot establish were pretextual. *See id.* at 15-16.

Plaintiff, however, contends that she has established a *prima facie* case for discrimination, showing that she suffered an adverse employment action that occurred under circumstances giving rise to an inference of discrimination. *See* Dkt. No. 57 at 12-19. First, Plaintiff argues that her rape by Beal constituted an adverse employment action. *See id.* at 13-14. Next, Plaintiff asserts that her forced transfer was an adverse employment action, as well as her constructive discharge. *See id.* at 14-19. Finally, Plaintiff contends that FedEx's proffered reason for failing to take action against Beal was a pretext for discrimination. *See id.* at 19-21.

In order to prove a *prima facie* case of gender discrimination, a plaintiff must establish the following: (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004). Only the third and fourth elements are at issue in the present matter.

An adverse employment action, according to the Supreme Court, "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

*Ellerth*, 524 U.S. at 761. "A tangible employment decision requires an official act of the enterprise, a company act." *Id.* at 762.

"An adverse employment action is 'a materially adverse change in the terms and conditions of employment.'" *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quotation omitted). "'To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quotation omitted). "'Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.'" *Id.* (quotation omitted).

In the present matter, Plaintiff relies on *Mathirampuzha v. Potter*, 548 F.3d 70, 78-79 (2d Cir. 2008), to support her argument that a rape may constitute an adverse employment action in the gender discrimination context. *See* Dkt. No. 57 at 13-14. In *Mathirampuzha*, the plaintiff alleged that his supervisor grabbed his arm, punched him in the shoulder and chest, spit in his face, and poked him in the eye. *See Mathirampuzha*, 548 F.3d at 73. The Second Circuit ultimately affirmed the dismissal of the plaintiff's disparate treatment claim as it concluded that the alleged physical assault by a supervisor did not constitute an adverse employment action. *See id.* at 72, 74. Although the opinion notes that, in "limited circumstances," a single, acute incident of abuse may qualify as an adverse action, the court was discussing such allegations in the context of a hostile work environment claim. *See id.* at 78-79. Indeed, the cases upon which the Second Circuit relies to come to this conclusion are exclusively cases in which the plaintiff alleged a hostile work environment. *See id.* at 79 (citing *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136

(2d Cir. 2001); *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000); *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 59 (2d Cir. 2004)) (other citations omitted).

The Court agrees that, in the hostile work environment context, a single incident of abuse that is "extraordinarily severe," such as rape, can constitute sufficiently severe and pervasive harassment to support a hostile work environment claim. As FedEx correctly contends, however, in this context, accepting Plaintiff's argument that the rape constituted an adverse employment action for purposes of her gender discrimination claim would completely eviscerate the *McDonnell Douglas* burden shifting analysis as no employer could ever offer a legitimate, non-discriminatory reason for an assault or rape. As such, the Court finds Plaintiff's arguments without merit.

As to Plaintiff's remaining allegations, for the reasons set forth above, the Court finds that Plaintiff's alleged forced transfer was not an adverse action and she was not constructively discharged. Accordingly, the Court finds that FedEx is entitled to summary judgment as to Plaintiff's gender discrimination claim.

Additionally, even assuming that Plaintiff suffered an adverse employment action, the Court finds that Plaintiff failed to present any evidence creating an inference that the employment action occurred under circumstances giving rise to an inference of discrimination. During her deposition, Plaintiff was asked to identify how she was discriminated against based on her gender. In response, Plaintiff testified that the only way she was treated differently because she was a woman is that Beal would not have sexual harassed her. *See* Dkt. No. 51-3 at 109-110. Plaintiff did not identify a single action or failure by Accorso and Altavilla, or any other employee at FedEx, that she viewed as gender discrimination and further testified that no one other than Beal treated her differently based on her gender. *See id.* As such, the Court finds that the undisputed

facts establish that any alleged adverse employment action did not occur under circumstances giving rise to an inference of discrimination.

Finally, the Court finds that, even assuming Plaintiff established her *prima facie* case, FedEx has set forth legitimate, non-discriminatory reasons for its decisions, which Plaintiff cannot establish are pretextual. The undisputed facts clearly establish that the decision not to transfer or terminate Beal in March 2010 was not an action taken against Plaintiff. Rather, the action was taken because, despite the extensive investigation, FedEx was unable to substantiate Plaintiff's claims of sexual harassment and prove that Beal engaged in a terminable offense under FedEx policy. *See* Dkt. No. 58 at ¶¶ 61, 78. Since there were no open Senior Management positions within a fifty mile radius of the Syracuse Station, transferring Beal would have amounted to a forced relocation of Beal and his family when FedEx was unable to substantiate the alleged wrongful conduct. *See id.* at ¶ 81.

Plaintiff has not provided any evidence that would lead a rational trier of fact to conclude that the decision to not terminate Beal's employment and returning him to the Syracuse Station are false and the reasons proffered are actually just a pretext for discrimination. Plaintiff's conclusory allegation that Altavilla and perhaps Accorso wanted to retain Beal because he was improving the Syracuse Station's performance does not change this result. The only support for this contention is the fact that Altavilla, more than a year before Plaintiff raised her allegations against Beal, stated that it was the responsibility of the Operations Managers to ensure that the Senior Manager succeeded for the good of the station. This isolated remark is clearly insufficient to permit a reasonable trier of fact to conclude that FedEx's legitimate, non-discriminatory reasons were a pretext for discrimination.

Based on the foregoing, the Court grants FedEx's motion for summary judgment as to Plaintiff's gender discrimination claims.

### 4. Retaliation

First, FedEx argues that it is entitled to summary judgment as to Plaintiff's retaliation claim because Plaintiff failed to exhaust her administrative remedies. *See* Dkt. No. 51-2 at 28-29. According to FedEx, Plaintiff filed a single charge of discrimination with the EEOC on June 18, 2010, alleging only harassment and discrimination. *See id.* at 29. FedEx contends that Plaintiff's EEOC charge was prepared by an attorney and that Plaintiff testified that she was retaliated against when she was offered the opportunity to transfer and she learned that Beal would be allowed to continue working at the Syracuse Station. *See id.* (citing Dkt. No. 51-1 at ¶ 99). Plaintiff, however, argues that the Court has jurisdiction to consider Plaintiff's retaliation claim because it is reasonably related to her discrimination claim, which was brought before the EEOC. *See* Dkt. No. 57 at 32-33. Plaintiff argues that the acts underlying her retaliation were included in her EEOC complaint and, therefore, the allegations placed the EEOC on notice of a retaliation claim. *See id.* FedEx also contends that, even if the retaliation was exhausted, it is nevertheless subject to dismissal because she was not subject to a materially adverse action or that there is a causal connection between her alleged protected activity and such an adverse action. *See* Dkt. No. 51-2 at 30-31.

### a. Exhaustion of Administrative Remedies

"Before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency." *Williams v. N.Y.C. Housing Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing 42 U.S.C. § 2000e–5 (2000)). "In addition, the claimant must make the EEOC filing within 300 days of the

alleged discriminatory conduct and, before bringing suit, must receive a 'Notice of Right to Sue' letter from the EEOC." *Id.* (citing *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001)).

"Exhaustion is ordinarily 'an essential element' of a Title VII claim." *Williams*, 458 F.3d at 70 (quoting *Legnani*, 274 F.3d at 686). "Claims not raised in an EEOC complaint, however, may be brought in federal court if they are 'reasonably related' to the claim filed with the agency." *Id.* (citing *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993)).

The Second Circuit has recognized that "'[a] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" *Id.* (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359-60 (2d Cir. 2001)). "In this inquiry, 'the focus should be on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'" *Id.* (quoting *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003)) (other quotation omitted). "The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on both bases.'" *Id.* (quotation omitted). The "reasonably related" exception to the exhaustion requirement "'is essentially an allowance of loose pleading' and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering.'" *Id.* (quotation and other citation omitted).

Contrary to Plaintiff's allegations, the claims in her EEOC complaint are not reasonably related to the retaliation claim before the Court. *See* Dkt. No. 51-8. Plaintiff's EEOC complaint,

which was drafted by an attorney, contained only a single charge of discrimination, alleging only harassment and discrimination, and is devoid of any allegations that would suggest a retaliatory motive. *See id.* The only alleged protected conduct would be her complaints to Accorso and Altavilla in February and March of 2010. In the EEOC complaint, Plaintiff does not allege any conduct occurring after her initial complaint to Accorso that could be considered retaliatory. Rather, the EEOC complaint makes clear that Plaintiff was bringing claims related to her belief that "FedEx has engaged in a pattern and practice of unlawful sexual harassment by subjecting Ms. Kennedy to unwelcome sexual harassment and assault, including, but not limited to, rape, sexual physical assault, sexual advances, and verbal sexual harassment." *Id.* at ¶ 54. The EEOC complaint further alleges that FedEx was aided and abetted by Beal, and that the unwelcome conduct "created an intimidating, oppressive, hostile, and offensive work environment which severely interfered with Ms. Kennedy's emotional and physical well-being, her ability to perform her work, and the other terms and conditions of her employment, thereby necessitating Ms. Kennedy's resignation." *Id.* at ¶ 56. These allegations are insufficient to provide the EEOC with notice that Plaintiff intended to bring a retaliation claim in addition to the claims explicitly set forth in the EEOC complaint. *See Madray v. Long Island Univ.*, No. 10-cv-3841, 2012 WL 2923500, *12 (E.D.N.Y. July 16, 2012) (dismissing the plaintiff's retaliation claim as unexhausted where the administrative complaint failed to set forth any facts that would place the EEOC on notice to investigate alleged retaliatory conduct); *Mathirampuzha v. Potter*, 548 F.3d 70, 76, 78 (2d Cir. 2008) ("The administrative complaint, in other words, alleged a single act of discrimination: Sacco's aggressive behavior toward the plaintiff on September 29, 2003. Nowhere did the plaintiff assert or imply a retaliatory motive for Sacco's conduct. . . . The

plaintiff's EEO complaint contains no factual allegations sufficient to alert the EEO to the possibility that Sacco's assault was the product of a retaliatory motive").

Based on the foregoing, the Court finds that Plaintiff's retaliation claim is unexhausted and grants FedEx's motion as to this claim.

### b. Merits of Plaintiff's Retaliation Claim

The clause in the section of Title VII which addresses retaliation states that it is "'an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." *Crawford*, 555 U.S. at 274 (quoting 42 U.S.C. § 2000e–3(a)). To establish a *prima facie* case for retaliation, a plaintiff must show that "'(1) [the employee] engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse [employment] action; and (4) there was a causal connection between the protected activity and that adverse action.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).

"A plaintiff engages in 'protected activity' when she (1) opposes employment practices prohibited under Title VII; (2) makes a charge of discrimination; or (3) participates in an investigation, proceeding or hearing arising under Title VII." *Bundschuh v. Inn on the Lake Hudson Hotels, LLC*, 914 F. Supp. 2d 395, 405 (W.D.N.Y. 2012) (citations omitted). "[I]n order to constitute a protected activity for purposes of a retaliation claim, the complaint must be related to discrimination on a basis prohibited by Title VII." *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 500 (E.D.N.Y. 2012) (citations omitted).

As to the third element in the *prima facie* case for retaliation, "'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this

context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 207 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Unlike a disparate treatment claim under Title VII, a retaliation claim "'is *not* limited to discriminatory actions that affect the terms and conditions of employment.'" *Id.* (quoting *White*, 548 U.S. at 64). "'[T]here are no bright-line rules' with respect to what constitutes an adverse employment action for purposes of a retaliation claim, and therefore 'courts must pore over each case to determine whether the challenged employment action reaches the level of "adverse."'" *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (quoting *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997)).

In the present matter, only the third and fourth elements are at issue. Plaintiff contends that she has established "that Altavilla and Accorso took several material adverse actions against her." Dkt. No. 57 at 33. Specifically, Plaintiff contends as follows:

> Kennedy has established that FedEx's investigation was anything but "thorough." It was an insular sham designed to disprove or "fail" to substantiate Kennedy's allegations. Altavilla and Accorso failed to review FedEx's own systems, internally maintained documents, like the Time Card Report, and interview key witnesses, even after Kennedy told Accorso that she was seeing a therapist. . . . They deliberately ignored evidence on their computer and security systems that confirmed significant aspects of Kennedy['s] claims. . . Following the investigation, they restored Beal to his position as Senior Manager and tried to force Kennedy to work with Beal at either the Syracuse Station or take a transfer to the Ramp where she would still have had to interact with Beal. . . .

Dkt. No. 57 at 33-34 (internal citations omitted).

Contrary to Plaintiff's assertions, the Court finds that Plaintiff has failed to set forth a *prima facie* case of retaliation. No reasonable trier of fact could conclude that these actions would dissuade a reasonable person from making or supporting a charge of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Rather, the undisputed facts

establish that FedEx took Plaintiff's complaint seriously by promptly suspending Beal, conducting a thorough investigation that lasted more than a month, and interviewed potential witnesses despite the fact that Plaintiff claimed that there were no witnesses. Further, although the most serious charges against Beal were not substantiated through their investigation, Beal was required to go through additional sexual harassment training and Plaintiff was provided the option of a lateral transfer at the Syracuse Ramp or to continue working with Beal, but with increased oversight provided by the Company. Although Plaintiff did not want to transfer to the Syracuse Ramp, the undisputed facts establish that the offered transfer was a lateral job transfer, that was completely voluntary, with no diminution in pay, benefits, or job responsibilities. Such an offer clearly does not constitute an adverse employment action sufficient to support a retaliation claim. *See Davis v. N.Y.S. Dep't of Corrections*, 110 F. Supp. 3d 458, 464 (W.D.N.Y. 2015) (citations omitted). Finally, even considering all of Plaintiff's claims in the aggregate, summary judgment is still warranted because the alleged conduct did not impact Plaintiff's employment in a material way for purposes of her retaliation claim. *See id.* (citation omitted); *see also Rodas v. Town of Farmington*, 567 Fed. Appx. 24, 28 (2d Cir. 2014) ("No different conclusion is warranted when the identified actions are viewed in the aggregate because they did not affect [plaintiff] in any materially adverse way").

Finally, the Court also finds that Plaintiff has also failed to demonstrate a causal connection between her protected activity and the alleged adverse action. The decisions about which Plaintiff complains were made by Accorso and Altavilla. Plaintiff testified that she does not believe that Accorso retaliated against her; and although she initially testified that she did not believe Altavilla retaliated against her, she later speculated that Altavilla may have retaliated against her because of a comment made about the performance of the Syracuse Station as a whole

made to "everybody" approximately a year and a half earlier. *See* Dkt. No. 58 at ¶¶ 100-101.

Nothing in the record suggests that Accorso or Altavilla had a specific intent to retaliate against

Plaintiff or that they would not have made these decisions but for a desire to retaliate. Plaintiff's

identification of one isolated comment a year and a half earlier that was completely unrelated to

Plaintiff's claims of harassment or FedEx's investigation into those claims is insufficient to

support a causal connection. *See Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir.

2007).

     Based on the foregoing, the Court grants FedEx's motion for summary judgment as to

Plaintiff's retaliation claim.

## D.    Plaintiff's Aid and Abet Claim Against Defendant Beal

     While an individual employee is not ordinarily subject to suit under the HRL, "[u]nder the

aiding and abetting provision of NYHRL, an individual employee who actually participates in the

conduct giving rise to a discrimination claim may be held personally liable." *Miotto v. Yonkers

Pub. Sch.*, 534 F. Supp. 2d 422, 427 (S.D.N.Y. 2008); *see also* N.Y. EXEC. LAW § 296(6)

(McKinney 2013) ("It shall be an unlawful discriminatory practice for any person to aid, abet,

incite, compel or coerce the doing of any of the acts forbidden under this article"). In claims

regarding the actions of a supervisor, a plaintiff need not allege that the said supervisor personally

carried out the discriminatory conduct. *See Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F.

Supp. 2d 376, 384 (S.D.N.Y. 1999). "Rather, the case law establishes beyond cavil that a

supervisor's failure to take adequate remedial measures can rise to the level of 'actual

participation' under HRL § 296(6)." *Id.*

     Since the Court has found that FedEx is entitled to summary judgment as to all of the

alleged primary violations, Defendant Beal is entitled to summary judgment on Plaintiff's aiding

and abetting claim. *See International Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 363 (S.D.N.Y. 2007) (dismissing the plaintiff's aiding and abetting claim brought pursuant to N.Y. Exec. Law § 296(6) because "accessory liability may only be found where a primary violation has been established") (citations omitted).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that FedEx's motion for summary judgment (Dkt. No. 51) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 28, 2016
      Albany, New York

Mae A. D'Agostino
U.S. District Judge